**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WILLIAM MANGINO, DIANE GALLO, PAULA HENDERSON, KIRK MILLER, LISA MULIK, TIMOTHY MULIK, and DARLENE TUCCINARD, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 07-00370 |
| PENNSYLVANIA TURNPIKE COMMISSION, JOSEPH G. BRIMMEIR, Chief Executive Officer, Pennsylvania Turnpike Commission; ANTHONY Q. MAUN, Director of Accounting and Payroll, Pennsylvania Turnpike Commission; and TURNPIKE, SOFT DRINK, BEER DISTRIBUTOR AND MISCELLANEOUS EMPLOYEES, TEAMSTERS LOCAL UNION NO. 250, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge Nora Barry Fischer |
| Defendants. | ) | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for Summary Judgment and/or Partial

Summary Judgment. (Docket No. 48). The seven (7) Plaintiffs, William Mangino, Diane Gallo,

Paula Henderson, Kirk Miller, Lisa Mulik, Timothy Mulik, and Darlene Tuccinard, are state

employees of Defendant Pennsylvania Turnpike Commission ("PTC") and Turnpike Soft Drink,

Beer Distributor and Miscellaneous Employees ("Turnpike"). They are organized in a bargaining

unit represented by Defendant Teamsters Local Union No. 250 ("Local 250" or "250"). Plaintiffs,

who were once union members but have resigned,[1] brought this action challenging the constitutionality of the procedural scheme used by Defendant Local 250 for the calculation and collection of agency or "fair-share" fees from nonmembers in light of *Chicago Teachers Union v. Hudson*, 475 U.S. 292 (1986), and its progeny. Plaintiffs argue that the withholding of a portion of their union dues by PTC from their paychecks was in violation of their First Amendment rights to freedom of association and expression because the procedure by which Defendant Local 250 collected the fees was inadequate and because *Hudson* notice was not given prior to the deductions.

## II.    FACTUAL BACKGROUND

Under the Pennsylvania Public Employee Relations Act ("PERA"), 43 Pa. Stat. Ann. §§ 1101.1, *et. seq.* (1993), Plaintiffs William Mangino, William Gallo, Paula Henderson, Kirk Muller, Lisa Mulik, Timothy Mulik, and Darlene Tuccinard are state "public employees"of Defendant PTC, while PTC is considered a "public employer." (Docket Nos. 50 and 52, at ¶8). For the purposes of the Public Employee Fair Share Fee Law ("PEFSFL"), 43 Pa. Stat. Ann. §§ 1102.1, *et. seq.* (1993), Defendant PTC is a "political subdivision" and Local 250 is an "employee organization" and the "exclusive representative" of PTC's employees. (*Id.* at ¶¶8-9). Pursuant to these laws, Defendants PTC and Local 250 have negotiated a series of collective bargaining agreements ("CBAs" or "CBA") which control the terms and conditions of Plaintiffs' employment. (*Id.* at ¶9-10).

The CBA under which Plaintiffs resigned contained a clause that required as a condition of employment that any employee who was a member of the union on the effective date of the

---

[1]

The parties dispute whether some of the Plaintiffs had "constructively" resigned from union membership before sending formal resignation letters. Plaintiffs seek restitution of their withheld wages for the time period between their claimed constructive resignation and their official resignation, as well as for the time period since their formal resignation. (Docket No. 49, at 2; Docket No. 1 at 15).

agreement, i.e October 1, 2004, must remain a member for the duration of the CBA with the exception that any employee may resign from the union fifteen (15) days prior to the agreement's expiration date.[2] (Docket Nos. 50 and 52, at ¶14). Plaintiffs contend that they resigned from their membership in the union either by "constructively" resigning or by tendering resignation letters on various dates.[3] (Docket No. 50 at ¶15; *see also* Transcript of Oral Argument held on May 9, 2008 ("Trans.") at page ("p.") 6, lines ("ll.") 5-7). Defendants agree that Plaintiffs are no longer members of the union. However, Defendants dispute whether the Plaintiffs "constructively" resigned prior to their written letters. (Docket No. 52 at ¶¶ 7, 15).[4] Defendants argue that Plaintiffs were allowed to resign once they provided their written requests to do so in accordance with Local 250's by-laws that specifically provide that resignation from the union has to be by written request or by written resignation. (Trans. at p. 17, ll. 14-16). Nevertheless, on the date of the filing of their Complaint, all Plaintiffs had effectively resigned from union membership.

In addition to sending notification letters to the PTC regarding their resignations, each Plaintiff contemporaneously sent a letter to Local 250 invoking his/her constitutional rights under

---

[2]

Plaintiffs refer to this provision as a "forced-unionism" or "compulsory unionism" article. (Docket No. 50 at ¶14; Transcript of Oral Argument held on May 9, 2008 ("Trans.") at page ("p.") 6, lines ("ll.") 13-14)). However, Defendants state that this section simply describes the union security clause, as employees are not forced to join Local 250. (Docket No. 52 at ¶ 14). Under PERA, this type of article is defined as a "maintenance of membership" provision. 43 Pa. C.S. § 1101.301(18). Thus, the Court will view the instant provision as such.

[3]

Plaintiffs William Mangino, Diane Gallo, Paula Henderson, Lisa Mulik, and Timothy Mulik each claim to have constructively resigned in the fall of 2004 through conversations with union officers regarding their desires to resign. (Docket No. 50 ¶ 15). These five (5) Plaintiffs sent their formal written resignation letters to the union in August of 2005. (*Id.*). Plaintiff Kirk Miller claims to have constructively resigned on November 21, 2004 when he conveyed his desire to resign. (*Id.*). Miller sent his formal letter in March of 2007. (*Id.*). Plaintiff Darlene Tuccinard sent a formal resignation letter to the union on or about September 27 or 28, 2006. (*Id.*).

[4]

As discussed herein, this issue will not be decided by the Court in the instant opinion.

*Hudson, supra.* (Docket Nos. 50 and 52, at ¶16). The letter, identical to the one sent by all Plaintiffs, is attached to Plaintiffs' Complaint. (Docket No. 1, at ¶15, Exh. B). The letters state, in part, the following:

> I object to the collection and expenditure of a fee for any purpose other than my pro rata share of the union's costs of collective bargaining, contract administration, and grievance adjustment, as is my constitutional right under Abood v. Detroit Board of Education, 431 U.S. 209 (1977). Pursuant to Chicago Teachers Union v. Hudson, 475 U.S. 292 (1986) I request that you provide me with my First Amendment procedural rights.

(Docket No. 1, Exh. B). In response to the Plaintiffs' letters, Local 250's Secretary-Treasurer Gary F. Pedicone sent notices to each Plaintiff informing them that they remained liable for a reduced "financial core fee" equal to 92.01 % of full union dues. (Docket Nos. 50 and 52, at ¶17).[5] Additionally, in response to the resignations, Mr. Pedicone instructed the PTC to deduct a reduced fee, i.e the agency fee, from the paychecks of each Plaintiff equal to 92.01 % of full union dues. (Docket Nos. 50 and 52, at ¶ 21).[6]

Plaintiffs contend that Local 250 did not provide information regarding the procedures for objecting to the "financial core fee." (Docket Nos. 50 and 52, at ¶19). Plaintiffs further argue that the union failed the *Hudson* test by not providing for a reasonably prompt opportunity to object to the fee and for an escrow of amounts reasonably in dispute. (Trans. at p. 8, ll. 7-12). According to

---

[5]

Mr. Pedicone's notices to each of the Plaintiffs, all dated October 26, 2006, are attached to Plaintiffs' Complaint as Exhibit D. Each notice consists of a cover letter and an eight-page "Statement of Total Expenses and Allocation of Expenses Between Chargeable and Non-Chargeable Expenses" for the period ending December 31, 2005. (Docket No. 1, Exh. D).

[6]

Defendant PTC has continued to deduct the fair share fees and Local 250 has continued to accept payment of these fees from Plaintiffs' wages. The amounts seized from Plaintiffs since April 16, 2007 have been deposited with the Clerk of Courts. (Docket Nos. 50 and 52 at ¶ 22).

the union, however, this information was included in Local 250's newsletters which were mailed to all members, and fair share fee payers annually, in addition to being posted on bulletin boards at various work locations. (Docket No. 52, at ¶19).[7] Additionally, Local 250 states and Plaintiffs admit that these newsletters were posted at various work locations at the Pennsylvania Turnpike. (*Id.*). However, Plaintiffs contend that the newsletters attached to Local 250's Answer, which the union claims to have mailed, are only portions of the newsletters that were posted on union bulletin boards. (Docket No. 50 at ¶20). Conversely, Defendants state that these attachments constitute the entire newsletters that were posted and mailed. (Docket No. 52 at ¶20).

Moreover, Plaintiffs argue that the allegedly mailed newsletters were constitutionally deficient because they required an objection to be renewed annually, which, they argue, does not comply with Pennsylvania law. (Trans. at 9, ll. 1-6).[8] They further argue that the notices "simply [failed] to notify the nonmembers of their rights to challenge and to escrow" and that the procedures are " a laundry list of requirements that have been struck down by other courts." (*Id.* at ll. 7-12). Specifically, Plaintiffs contend that the procedures are unconstitutional for the following reasons: (1) they require potential objectors to request detailed accounting of expenditures before they are actually sent to objectors; (2) they require challengers to exhaust their administrative remedies; and (3) they state that they are final and binding. (*Id.* at ll. 13-25). Furthermore, the procedures and

---

[7]

The newsletters are attached to Defendant Local 250's Answer as Exhibits A, B, and C. (Docket Nos. 17-2, 17-3, and 17-4). Each newsletter provides, *inter alia*, that employees who are nonmembers but pay a fair share fee "may request an adjustment in that fee based on their objection to union expenditures they believe are not reasonably related to collective bargaining, contract negotiations, and grievance adjustments." (Docket No. 17-2 at 1).

[8]

The Courts notes that these arguments put forth by Plaintiffs at the hearing were not raised in their briefs in support of their motion for summary judgment.

accounting information were not sent to nonmembers, thus the Defendants failed to comply with *Hudson*. (*Id.* at p. 10, ll. 1-6).

The reduced financial core fee withheld from Plaintiffs' wages was calculated from an independent audit conducted by C.J. Panagulias & Company ("Panagulias"), Local 250's independent auditor. (Docket Nos. 50 and 52 at ¶17, 25). Plaintiffs contend that Local 250 failed to provide financial audit information regarding affiliated state and national labor organizations which received a portion of the fair share fees. Defendants, however, claim that the audited report of Local 250's expenditures provided sufficient financial disclosure of payments made to affiliated organizations. (*Id.* at ¶ 24).

In its audit of Defendant Local 250 for the year ending 2005, Panagulias did not make an allocation of chargeable expenses[9] of Local 250's affiliates to whom dues are paid.[10] Panagulias did not have any information to support its determination that the expenditures of certain affiliates were 100 % chargeable. (*Id.* at ¶25; *see also* Trans. at p. 34, ll. 22-25). Additionally, it did not provide accounting services for state or national labor organizations affiliated with Local 250 receiving a portion of Plaintiffs' fees. (*Id.* at ¶26). Furthermore, Plaintiffs claim that Panagulias did not receive audited reports from Defendant International Brotherhood of Teamsters ("IBT") between 1999 and 2007. Thus, Plaintiffs contend that there was no basis for allocating between chargeable and non-

---

[9]

In the context of labor unions, chargeability audits performed by independent accountants ensure that a union has correctly calculated which of its expenses are chargeable to nonmembers. That is, a labor union's fair share fee determination is evaluated to determine whether it is accurate. *See Gwirtz v. Ohio Educ. Ass'n.*, 887 F.2d 678, 680 (6th Cir. 1989) (citing *Hudson*, 475 U.S. 292).

[10]

Local 250 is affiliated with and pays monies to Defendant IBT, Pennsylvania Conference of Teamsters, and Teamsters Joint Council # 40. (Docket Nos. 50 and 52 at ¶¶ 10, 23, 27).

chargeable expenses for Local 250 affiliates receiving a portion of the fees. (Docket No. 50, at ¶¶ 27, 28). Contrary to *Hudson*'s requirements, Plaintiffs contend that while some disclosure had been made no audited disclosures were provided for the various affiliates to which Local 250 pays fees. (Trans. at p. 7, ll. 19-24).

Plaintiffs also claim that Panagulias relied on unaudited assertions of IBT officials in preparing the portion of the chargeability audit regarding payments made by Local 250 to IBT. (Docket No. 50, at ¶28). They further claim that Panagulias simply assumed that IBT's expenditures were 100 % chargeable. (*Id.*). However, Defendant denies this assertion. (Docket No. 52, at ¶28). In conducting the chargeablility audit for Local 250, Panagulias did not look at time sheets of employees of Local 250 or produce any spreadsheets or data for the purposes of the audit. (Docket Nos. 50 and 52, at ¶29). The parties also dispute whether Panagulias was hired to conduct a chargeability audit for Defendant Local 250 because the formal request for a chargeability audit was omitted from the engagement letter through an oversight on the part of Panagulias. (*Id.* at ¶ 30). However, Plaintiffs state and Defendants admit that Panagulias did complete a chargeability audit which took about three to four hours to perform. (*Id.* at ¶ 31).

A chargeability audit report for IBT for the year ending December 31, 2005 was not completed until August of 2007. Therefore, Panagulias could not and did not rely upon an audit report for IBT in preparing its report for Local 250. (*Id.* at ¶ 33-34). Furthermore, Panagulias did not verify any of the information it did receive. (Trans. at p. 44, ll. 1-4). The 2005 report for IBT, which Plaintiffs maintain relied on an audit for 2004, indicated a chargeablility figure of 83.96 %. Said report was not given to the Plaintiffs until 2007, and this figure is different than the figure provided by the union to Plaintiffs. (Docket No. 50, at ¶ 34; Trans. at p. 44, ll. 7-10). Defendants

dispute the chargeability figure, arguing that the only audited report prior to the August 2007 report was for the year ending December 31, 1999, which showed a chargeability figure of 88.14 %. (Docket No. 52, at ¶34). Defendants argue that the audit conducted of Local 250's expenses was based upon prior IBT audits and the figures varied because different calculations were used and expenses were different. (Trans. at p. 45, ll. 10-18). Plaintiffs further contend that the IBT chargeability figure for 2005 provided to Panagulias in 2007 was 61.37 %, and was based upon information from 1999. (Docket No. 52, at ¶34). Plaintiffs argue this was improper because unions may not rely upon "stale financial data" in conducting an audit. (Trans. at p. 46, ll. 18-25).

In preparing the report for Local 250, Panagulias based its determination of expenditures by the Pennsylvania AFL-CIO and other affiliates of Local 250 generally by "word of mouth." (Docket Nos. 50 and 52, at ¶35). Teamsters Joint Council # 40 was the only Local 250 affiliate for which Panagulias received a financial disclosure. Although Panagulias did receive unaudited documents from the Pennsylvania Conference of Teamsters, these documents gave no indication of whether an audit had been performed. (Docket Nos. 50 and 52, at ¶¶ 36, 37). In addition, Local 250 did not have an audit performed for its chargeable expenditures for the year ending December 31, 2004. (Docket Nos. 50 and 52, at ¶38).

Plaintiffs have moved for summary judgment and/or partial summary judgment arguing that there are no genuine issues of material fact as to the constitutionality of the procedural notices provided by Defendant Local 250 and the improper seizure of agency fees from Plaintiffs in violation of the First, Fifth, and Fourteenth Amendments.[11] (Docket No. 48 at 1-2). At oral argument, it was

---

[11]

The Court will not address Plaintiffs' claim under the Fifth Amendment to the United States Constitution as the Fifth Amendment does not directly apply to the states. Rather, the procedural due process safeguards of the Fifth Amendment are made applicable to the states by the Fourteenth Amendment. *Kelo v. City of New London*, 545 U.S. 469,

represented that Plaintiffs did not assert any claims that the mathematical calculations used by the union were wrong. (Trans. at 18, ll. 5-7). It was further represented by Plaintiffs that the union has taken no steps to change its procedures. (*Id.* at p. 13, ll. 9-21). However, Defendants did put all of the disputed funds into an escrow account with the clerk of courts. (*Id.* at p. 18, ll. 11-17). The Court also notes that counsel indicated at the hearing that during discovery, Defendants provided to Plaintiffs' counsel audited reports of some of the affiliated organizations to which the union pays fees. (*Id.* at p. 19, ll. 4-12, 21-25; p. 20, ll. 4-11).

## III.    PROCEDURAL HISTORY

On March 21, 2007, Plaintiffs filed their Complaint (Docket No. 1) pursuant to 42 U.S.C. § 1983 against Defendants PTC, PTC's Chief Executive Officer, Joseph G. Brimmeir ("Brimmeir"), PTC's Director of Accounting and Payroll, Anthony Q. Maun ("Maun"), Local 250, IBT, and Turnpike seeking preliminary and permanent injunctive relief, declaratory relief, and monetary damages for alleged violations of PERA and PEFSFL. (Docket Nos. 50 and 52, at ¶1). Plaintiffs allege that their First and Fourteenth Amendment[12] rights have been violated by Defendants through the requirement that the Plaintiffs pay monthly "fair share" dues without having first been provided with sufficient *Hudson* notice and information regarding Defendants Local 250 and IBT's chargeable expenses. (Docket No. 50, at ¶1). Plaintiffs also seek compensatory damages, attorney's fees, and

---

496 (2005). Thus, the Court will analyze Plaintiffs' procedural due process claim within the purview of the Fourteenth Amendment.

12

The First Amendment to the United States Constitution safeguards the right to free speech. U.S. CONST. AMEND. 1. The provisions of the First Amendment bind state actors by way of incorporation through the Due Process Clause of the Fourteenth Amendment. *See Locke v. Davey*, 540 U.S. 712, 718 (2004).

restitution of all agency fees improperly collected from their paychecks. (Docket Nos. 50 and 52, at ¶2).

On April 4, 2007, Plaintiffs filed a Motion for Preliminary Injunction (Docket No. 3), to which Defendants Turnpike, Local 250, and IBT filed a Response on April 19, 2007. (Docket No. 19). On April 13, 2007, Defendants Turnpike, Local 250 and IBT filed a Motion to Deposit Funds With the Court in an Interest Bearing Account pursuant to Fed. R. Civ. P. 67 and Local Rule 67.2, in which they requested that funds pertaining to the disputed fair share fees be invested by the Clerk of Courts. (Docket No. 15). The Court granted said motion on April 16, 2007. (Docket No. 16). Defendants Turnpike, Local 250, and IBT filed their Answer on April 16, 2007. (Docket No. 17).

On April 20, 2007, Defendant PTC filed an Answer with a Cross-Claim against Defendants Turnpike, Local 250, and IBT, along with a Response to Plaintiffs' Motion for Preliminary Injunction. (Docket Nos. 21 and 22, respectively). Defendant Local 250 and the Plaintiffs filed Answers to Defendant PTC's Cross-Claim on April 25, 2007. (Docket Nos. 24 and 25, respectively). On April 26, 2007, Plaintiffs filed their Replies to Defendants Turnpike, Local 250, and IBT's Response to Plaintiffs' Motion for Preliminary Injunction; Defendant PTC's Answer and Cross-Claim; and Defendant PTC's Response and Brief in Opposition to Plaintiffs' Motion for Preliminary Injunction. (Docket No. 26).

The Court heard oral argument on Plaintiffs' Motion for Preliminary Injunction on May 17, 2007. (Docket No. 28). Subsequently, the parties filed supplemental authorities addressing said pending motion. (Docket Nos. 33 and 34). As Plaintiffs' motion was taken under advisement, the Court stayed the action (Docket No. 37) while the parties participated in a settlement/mediation conference with the Honorable Francis X. Caiazza serving as mediator. However, the parties were

unable to settle the case and the case was referred back to this Court. (Docket No. 40). On July 30, 2007, the Court denied Plaintiffs' Motion for a Preliminary Injunction and lifted the stay, allowing the case to proceed through discovery.

On October 19, 2007, Panagulias filed a Motion for Protective Order and a Motion to Quash Plaintiffs' Subpoena (Docket No. 43), as Plaintiffs had served a subpoena upon Panagulias to have one of its accountants appear for a deposition and to produce several documents relating to services provided to Local 250 and to other non-party labor organizations. (*Id.* at 3-4, ¶¶ 6-8). Panagulias argued that any documents relating to its business with non-party labor organizations was irrelevant, confidential, and sought for improper purposes. (*Id.* at 4-6, ¶¶ 10-13, 20-24). Plaintiffs filed their Brief in Opposition to Panagulias' Motions on October 22, 2007. (Docket No. 44). Panagulias filed a reply brief in support of its motions on November 15, 2007. (Docket No. 46). The Court granted Panagulias' motions on November 16, 2007, thereby relieving Panagulias of any obligation to produce the disputed documents or to respond to any questions relating to its relationship with non-party labor organizations. (Docket No. 47).

Plaintiffs filed their Motion for Summary Judgment and/or Partial Summary Judgment, Brief in Support, and Statement of Material Facts on December 9, 2007. (Docket Nos. 48 - 50). The Defendants' collective Response to Plaintiffs' Statement of Material Facts and Brief in Opposition to Summary Judgment were filed on January 2, 2008. (Docket Nos. 52 and 53). The Court held a status conference on January 4, 2008 (Docket No. 54), wherein the parties requested oral argument. Thereafter, Plaintiffs filed a Reply Brief in support of their motion on January 15, 2008. (Docket No.

58). On May 9, 2008, the Court heard argument[13] wherein the parties indicated to the Court that supplemental briefing was not necessary; however, the Court ordered Plaintiffs to file supplemental declarations to correct their improperly filed appendices to their statement of facts. (Docket No. 59). Accordingly, Plaintiffs filed said Corrected Declarations on May 15, 2008. (Docket No. 61). As the motions are properly supported and have been fully briefed, they are now ripe for disposition.

## IV.    SUMMARY JUDGMENT STANDARD

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Pursuant to Rule 56, the court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby*, 477 U.S. 242 (1986).

In evaluating the evidence, the court must interpret facts in the light most favorable to the non-moving party, and draw all reasonable inferences in their favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007). Initially, the burden is on the moving party to demonstrate that the evidence in the record creates no genuine issue of material fact. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). The dispute is genuine if the evidence is such that a

---

[13]

Oral argument was originally scheduled for February 13, 2008, however due to water problems at the courthouse and scheduling conflicts with counsel, the hearing was rescheduled for May 9, 2008.

reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 249. "The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment." *Turner v. Leavitt*, Civil Action No. 05-942, 2008 WL 828033, at *4 (W.D. Pa. March 25, 2008) (citing *Horta v. Sullivan*, 4 F.3d 2, 8 (1st Cir. 1993) (citing 10 WRIGHT AND MILLER, FEDERAL PRACTICE § 2721 at 40 (2d ed.1983))); *Pollack v. City of Newark,* 147 F. Supp. 35, 39 (D.N.J. 1956), *aff'd*, 248 F.2d 543 (3d Cir. 1957), *cert. denied*, 355 U.S. 964 (1958) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

While the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the admissible evidence in the record would be insufficient to carry the non-movant's burden of proof at trial. *Celotex*, 477 U.S. at 322-23. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. *Id.* at 324. The nonmoving party "cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## V.  DISCUSSION

In their Motion for Summary Judgment and/or Partial Summary Judgment, Plaintiffs argue that there are no genuine issues of material fact as to whether Defendants' notices failed to comply with the constitutional requirements for the collection of agency fees as set forth in *Hudson*. (Docket No. 49 at 9). Specifically, Plaintiffs argue that Defendants did not take the appropriate steps to inform them of their rights pursuant to *Hudson* by failing to provide adequate notice of the procedures for objecting to agency fees after their formal resignations and by failing to provide the requisite financial disclosures. (*Id.*).

### A.  *Hudson*'s Constitutional Requirements

Plaintiffs acknowledge that Local 250, as the designated exclusive collective bargaining representative, can require as a condition of employment that public nonunion employees pay a share of the union's costs incurred in its representative activities. *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977). Furthermore, Pennsylvania permits "agency shop" agreements between an employee's union and a public employer, such as the PTC. *See* 43 Pa. C.S. § 211.7; *see also Otto v. Pa. State Educ. Ass'n.*, 330 F.3d 125, 129 (3d Cir. 2003). These agreements designate one exclusive representative of individual union members who conducts all contract negotiations. *Abood*, 431 U.S. at 224; 43 Pa. C.S. § 211.7. Therefore, nonmembers "may reap the benefit of union negotiations without joining the organization" thereby creating a "free-rider" problem. *Abood*, 431 U.S. at 224. To prevent this problem, unions are permitted to impose a "fair share fee" on nonunion employees to require them to pay an equal share of the union's cost of operations. 71 Pa. Stat. Ann. § 575; *Otto*, 330 F.3d at 129.

A nonmember's First Amendment rights are infringed upon when his employment is conditioned upon the payment of fees under an agency shop agreement. However, this infringement is justified in the interest of labor peace and avoiding "free riders." *Abood*, 431 U.S. at 224-226; *see also Hudson*, 475 U.S. at 301, n.8. Nonetheless, nonmembers cannot be required to contribute to costs related to political or other activities not associated with the union's role as a bargaining representative. *Abood*, 431 U.S. at 234. That is, chargeable activities include only those that are "germane" to the collective bargaining activity and that do not substantially add to the infringement of First Amendment rights inherent in union shop fees assessed from state employees. *Lehnert v. Ferris Faculty Ass'n.*, 500 U.S. 507, 519 (1991) (discussing agency fees in the public sector). Agency fees may be "used to finance expenditures by the [u]nion for the purposes of collective bargaining, contract administration, and grievance adjustment." *Abood*, 431 U.S. at 225-26.

The United States Supreme Court in *Chicago Teachers Union v. Hudson*, 475 U.S. 292, set forth procedural requirements to ensure that nonmembers' constitutional rights were not unduly infringed and to ensure that fees under an agency shop agreement are properly calculated to prevent compulsory subsidization. The *Hudson* court held that the following requirements must be satisfied before agency fees may be constitutionally withheld: (1) adequate explanation of the basis for the fee; (2) a reasonably prompt opportunity to challenge the fee amount before an impartial decisionmaker; and (3) an escrow for the amounts reasonably in dispute while such challenges are pending. *Id*. at 305-307.

Additionally, in order to protect a nonmember's First Amendment rights, the procedure for collecting agency fees must "be carefully tailored to minimize [such an] infringement." *Hudson*, 475 U.S. at 303. With regards to *Hudson*'s second requirement, the Supreme Court held that a local

union representing over 25,000 employees and collecting over $ 4 million in annual dues must provide nonmembers with "sufficient information to gauge the propriety of the union's fee." *Id.* at 306. When the procedures are carefully tailored to provide adequate disclosures that include the major categories of expenses, as well as a verification by an independent auditor, this requirement is satisfied. *Id.* at 307, n.18. This does not mean that the union has to provide a detailed and exhaustive list, but what it does provide must be sufficiently adequate to allow a nonmember to judge the calculation of the fee with regard to the relationship between the fee and nonunion employees' pro rata share of union expenses attributable to collective bargaining activities. *Hudson*, 475 U.S. at 306-07; *see also Hohe v. Casey*, 956 F.2d 399, 410 (3d Cir. 1992). The court further stated that "when nonmembers do not receive this information, their constitutional rights are violated under *Hudson*."[14] *Otto*, 330 F.3d at 131 (citing *Hudson*, 475 U.S. at 415).

The United States Court of Appeals for the Third Circuit has applied *Hudson* to require state-level exclusive bargaining representatives for about 54,000 employees to obtain independent auditor verification. *Otto*, 330 F.3d at 131 (citing *Hohe*, 956 F.2d 399). The accountant performing the audit must be truly independent of the local, that is, the accountant cannot be employed in house. *Otto*, 330 F.3d at 135 (citations omitted). However, the Court of Appeals for the Third Circuit in *Otto* stated that the "independent audit requirement does not require the auditor to verify the local union's classification of expenses as chargeable or nonchargeable." *Id.*

In support of their motion, Plaintiffs contend that while some disclosures have been made to them regarding Local 250's expenditures, there is no factual dispute over whether any audited

---

14

The requisite content of the *Hudson* notice has been a matter of significant debate in the lower federal courts. *See Otto*, 330 F.3d at 128, *Tierney v. City of Toledo*, 917 F.2d 927, 933-38 (6th Cir. 1990); *Prescott v. County of El Dorado*, 915 F.Supp. 1080, 1086, n.9 (E.D. Cal. 1996).

disclosures were provided for any of 250's various affiliates to which it pays fees. (Docket No. 49 at 10). Plaintiffs further argue that they were never informed of their procedural rights to challenge the fee calculation nor of their right to an escrow account and opportunity to challenge before an impartial decisionmaker. (*Id.* at 11, 15). Thus, Plaintiffs argue, Defendants did nothing to comply with *Hudson*. In reply, Defendants claim that they mailed newsletters with the information required by *Hudson*, in addition to posting them at various locations. Further, Defendants argue that summary judgment is improper because the following three disputed material facts exist: (1) whether the Plaintiffs were given the *Hudson* notice as set forth in Defendant Local 250's newsletters; (2) whether some of the Plaintiffs "constructively resigned" prior to their formal written notifications; and (3) whether Panagulias was engaged by Local 250 to conduct an audit of Defendant Local 250's allocation between chargeable and nonchargeable expenses. (Docket No. 53 at 2-4). The Court will address each of these arguments, in turn.

B.    **Application of the *Hudson* Test**[15]

The parties dispute whether Plaintiffs actually received mailed notice of the Local 250's *Hudson* procedures. (*See* Docket Nos. 50 and 52, at ¶ 19-20; Trans. at p. 8, ll. 21-23). However, as discussed *infra*, even if the Court were to assume that Plaintiffs did receive mailed notice, Plaintiffs still partially prevail on their summary judgment motion because the notice that Defendants claim to have mailed was not sufficiently adequate according to *Hudson* and its progeny. Said notice was deficient because it failed to provide audit information for the various affiliates receiving a

---

[15]

Previous fair share fee cases have interpreted *Hudson* to regard the questions of the adequacy of union notice and procedures as legal questions that may be resolved on motions for summary judgment. *See Tierney v. City of Toledo*, 917 F.2d 927, 931 (6th Cir. 1990); *Mitchell v. Los Angeles Unified Sch. Dist.*, 739 F.Supp. 511, 514 (C.D. Cal. 1990); and *Laramie v. Cnty. of Santa Clara*, 784 F.Supp. 1492 (N.D. Cal. 1992). Therefore, the Court will regard these questions as such.

portion of their fees. *See Hudson*, 475 U.S. at 307, n.18, 310; *Otto*, 300 F.3d at 130-33. Therefore, since the notices were constitutionally deficient, the factual dispute over whether Plaintiffs received the notices is of little consequence to the Court's decision in this matter.

Defendants argue that they provided Plaintiffs adequate explanation of the basis of their fees in accordance with *Hohe v. Casey* and *Hudson*. They assert that the disclosure of the exact amount of its disbursements and chargeability percentages associated therewith regarding IBT, Council # 40 Pennsylvania Conference of Teamsters, and Pennsylvania AFL-CIO satisfied the *Hudson* requirements. (Docket No. 53, at 5-6; Trans. at p. 19, ll. 1-12). Plaintiffs, however, argue that since no financial disclosures were provided for these affiliates before fees were exacted, Defendants failed to satisfy *Hudson* and have violated their First Amendment rights. (Trans. at p. 33, ll.17-25). The Court agrees with the Plaintiffs for the following reasons.[16]

In *Otto,* the United States Court of Appeals for the Third Circuit held that in the context of deciding whether certain union expenses may be charged to nonmembers, "the First Amendment affords public-sector employees the freedom not to associate with labor organizations." *Otto*, 330 F.3d at 128. In order to protect this right, *Hudson* clearly requires "an adequate explanation for the advance reduction of dues." *Hudson*, 475 U.S. at 309. *Hudson* specifically held that unions must disclose the accounting of payments to affiliate state and national labor organizations or show that none of the payments made were used to subsidize activities for which nonmembers may not be charged. *Id.* at 307, n.18.

---

[16]

Plaintiffs have claimed that their procedural due process rights have been also been violated. In *Abood* and *Hudson*, the Supreme Court stated that in this context, "the procedures required by the First Amendment also provide the protections necessary for any deprivation of property." *Hudson*, 475 U.S. at 304, n.13. Therefore, the Court will analyze the problem from the perspective of the First Amendment.

Here, Local 250's financial disclosures indicate that it directs about 25 % of its total expenditures to affiliates, and in turn treats 83.6 % as chargeable to Plaintiffs. (*See* Docket No. 1, Exh. D; Docket Nos. 50 and 52, at ¶¶ 34-37). Defendants admit that in conducting the audit of Local 250, Panagulias wholly relied upon the unaudited assertions of IBT officials in preparing the chargeability figure related to payments made by Local 250 to the IBT. (Docket Nos. 50 and 52, at ¶ 28). Furthermore, for those affiliates for which no financial information was available at all, Panagulias simply assumed that 100 % was chargeable. (*Id.*). In making this assumption, the auditor relied upon the "word of mouth" of IBT officials. (*Id.* at ¶ 35). Additionally, the audit report made available to the Plaintiffs did not include any separate financials for any of the affiliates receiving fees. However, *Hudson* requires financial disclosure for every union receiving a portion of fees. *Hudson*, 475 U.S. at 307, n.18; *see also Otto*, 300 F.3d at 130-33. A nonmember has the right to know how his fees are being spent "prior to objecting so that [he or she] may evaluate the basis for an objection and consequently protect their First Amendment rights." *Hohe*, 956 F.2d at 409-11 (rejecting the use of "local union presumption"). Because Local 250 failed to provide the Plaintiffs with the financial information for the affiliates, the Court agrees with Plaintiffs that the disclosure was inadequate.

Additionally, in conducting the chargeability audit, Panagulias did not take into consideration any employee time sheets, spreadsheets of Local 250, or data collections. (*Id.* at ¶ 29). The only field work Panagulias performed consisted of a "conversation with a secretary at Local 250" and evaluating the year end balance sheets to determine chargeability. (*Id.* at ¶ 32). Joint Council # 40 was the only affiliate for which Panagulias had financial information, however, this information was not included in the materials provided to the Plaintiffs or in the audit report prepared by Panagulias.

(*Id.* at ¶ 36). With regard to the Pennsylvania Conference of Teamsters, Panagulias received unaudited documents which failed to indicate whether an audit of it had been performed. (*Id.* at ¶ 37). The Court is also troubled by the fact that Defendant Local 250 did not have a chargeability audit performed in the year prior to 2005. (*Id.* at ¶37). Based on these facts, the Court finds that Local 250 failed to provide a sufficient explanation of payments from union dues and therefore, Plaintiffs would have been unable to make an informed challenge to the fair share fee imposed on them.

In making this ruling, the Court is not holding that the Defendant is required to audit the records of its affiliates or submit financials for every organization with which it is affiliated. Local 250 may rely on the assertions of the individual associations as to their chargeable costs. However, the Supreme Court has stated, "[t]here must be some indication that the payment is for services that may ultimately enure to the benefit of the members of the local union by virtue of their membership in the parent organization. And, as always, the union bears the burden of proving the proportion of chargeable expenses to total expenses." *Lehnert,* 500 U.S. at 592-93. Here, the Court finds that Local 250's notice is inadequate because it fails to clearly explain what portion of its affiliate payments are chargeable. The Court further finds that Local 250's procedures for chargeability audits are faulty and incomplete.

Defendants argue that an issue of fact exists as to whether Panagulias was indeed hired to conduct a chargeability audit. (*See* Trans. at p. 27, ll. 11-17). As Plaintiffs are challenging the information contained in the chargeability audit report conducted by Panagulias, Plaintiffs cannot simultaneously claim that Panagulias was not engaged to conduct such a report based on an omission by Panagulias in its engagement letter. (*See* Docket Nos. 50 and 52, at ¶ 30). Based on the facts of

record and Plaintiffs' assertion that Panagulias spent "'three to four hours probably' in the field work performed in conducting the chargeability audit" and their assertions as to what the audit included (Docket No. 50, ¶ 31-32), the Court finds that Defendants' argument is without merit.

Since it has already been determined that Defendants have not satisfied the first prong of the *Hudson* test and thereby deprived Plaintiffs of their First Amendment rights, the Court need not address the last two prongs of the test.

Finally, Defendants argue that summary judgment is improper because the parties dispute whether some of the Plaintiffs "constructively resigned" from Local 250 prior to their written resignations.[17] The six (6) Plaintiffs who claim to have constructively resigned seek restitution of all of their withheld dues for the time period between when they orally expressed their desire to resign from the union and when they tendered their formal written resignation letters, on the basis that they were not provided any *Hudson* notice and were "lulled" into not sending written resignations. (Docket No. 49 at 2, 9). These Plaintiffs argue in their reply to Defendants' brief in opposition to their motion for summary judgment that this dispute bears "only on whether relief should be granted for the periods prior to the date of the Nonmembers' formal, written resignations." (Docket No. 58, at 2). The Court agrees with this assertion. However, the Court also finds that this factual dispute does not affect the Court's decision to grant partial summary judgment for Plaintiffs on the issue of the constitutionality of Local 250's notices. Accordingly, the Court will hold an evidentiary hearing to determine the amount of restitution owed to all of the Plaintiffs, within which the issue of alleged constructive resignation of six (6) of the Plaintiffs and the potential preclusive

---

[17] *See* notes 1 and 3, *supra*.

21

effect of Judge Wettick's decision in the state court case of *Teamsters Local 250 v. Allias, et al.*, Court of Common Please of Allegheny County, Case Nos. AR-06-8667, et al., will be determined.

## VI. APPROPRIATE REMEDIES

The Supreme Court held in *Hudson* that when a constitutional violation has been established, "the task of fashioning a proper remedy is one that should be performed by the District Court after all interested parties have had an opportunity to be heard." *Hudson*, 475 U.S. at 309, n.22. Furthermore, when there has been a violation of one's civil rights pursuant to 42 U.S.C. § 1983, the relief awarded must seek to "avoid recurrence of the violation[s] and to eliminate its consequences" and "remedy past wrong." *Id.* at 309, n.22 (citing *National Soc'y. of Prof. Engineers v. United States*, 435 U.S. 679, 697 (1978); and *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15-16 (1971)). Here, Plaintiffs seek injunctive and declaratory relief, nominal damages and restitution of withheld fees, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988 (2000).

### A. Injunctive and Declaratory Relief

In order to protect Plaintiffs' constitutional rights, the Court orders that declaratory judgment is entered in favor of the Plaintiffs and against the Defendants. Additionally, Defendants Local 250 and PTC are permanently enjoined from taking any action to further withhold fees from Plaintiffs' wages; however, nothing in this opinion shall preclude Defendants from collecting a fair share fee, provided that the procedure for collection hereafter complies with applicable law by providing adequate procedural safeguards as described in *Hudson*, *Lehnert*, and this opinion. *See Robinson v. Pa. State Corr. Officers Ass'n.*, 363 F.Supp.2d 751 (M.D. Pa. 2005); and *McCahon v. Pa. Tpk. Comm'n.*, 491 F.Supp.2d 522 (M.D. Pa. 2007).

### B. Nominal Damages and Restitution

1.     Nominal Damages

Plaintiffs have sought nominal damages for the failure to provide adequate notice prior to agency fees withholdings.  The Supreme Court has held that nominal damages are appropriate in actions brought pursuant to 42 U.S.C. § 1983 where the deprivation of constitutional rights is not shown to have caused actual injury.  *See Carey v. Piphus*, 435 U.S. 247, 266-67 (1978).  The United States Court of Appeals for the Third Circuit has held that in an agency fee context when "constitutional rights are violated under *Hudson*" the Plaintiffs are entitled to nominal damages of $1.00.  *Hohe*, 956 F.2d at 415-16.  The Court therefore finds that nominal damages are appropriate here and orders that the seven (7) Plaintiffs recover from Defendants nominal damages in the amount of $ 1.00 each.  *Id.*

2.     Restitution

Plaintiffs also seek restitution for the fees withheld during the time period between their claimed constructive resignation and their formal resignation, and also for fees withheld during the time period since each of their respective formal resignations.  They argue that unless the Court orders return of the wrongfully withheld fees, the holding of *Hudson* would be rendered a "virtual dead letter."  (Docket No. 49, at 18).

Restitution is not a type of damages but rather it is normally awarded as a substitute for damages aimed at forcing the defendant to return benefits it wrongfully took in the first instance.  *Laramie v. Cnty. of Santa Clara*, 784 F.Supp. 1492, 1501 (N.D. Cal. 1992) (citing  Dan B. Dobbs, HANDBOOK ON THE LAW OF REMEDIES 224 (1973)).   A constitutional violation does not always call for a punitive remedy.  *Gilpin v. AFSCME, AFL-CIO*, 875 F.2d 1310, 1315 (7th Cir. 1989), *cert. denied*, 493 U.S. 917 (1989). Therefore, a return of all fair share fees would undermine the policy

of the Supreme Court's decisions in *Hudson* and *Lehnert*. *Lowary v. Lexington Local Bd. of Education*, 903 F.2d 422, 433 (6th Cir. 1990), *cert. denied*, 498 U.S. 958 (1990). Instead, the United States Court of Appeals for the Third Circuit has held that nonmembers are entitled to recover only the nonchargeable portion of the unconstitutionally collected fees. *Hohe*, 956 F.2d at 416.

Here, Defendant Local 250's error was its failure to include adequate financial disclosures regarding its affiliates which received more than a quarter of its total monies. The evidence of record does not establish that Defendants acted maliciously nor do Plaintiffs seek punitive damages. Therefore, the Court finds that Plaintiffs are entitled to recover an amount equal to the total of the nonchargeable portions of the collected fair share fees, plus accrued interest. As discussed *supra*, the Court will hold an evidentiary hearing to determine the amount of these fees.

## C.    Attorneys' Fees and Costs

The Court finds that Plaintiffs are entitled to an award of their reasonable attorneys' fees and costs, pursuant to 42 U.S.C. § 1988. Evidence pertaining to said fees and costs shall be submitted pursuant to the Order which follows.

## VII.    CONCLUSION

Based on the foregoing, Plaintiffs' Motion for Summary Judgment and/or Partial Summary Judgment [48] is GRANTED in part, and DENIED in part. The Court grants summary judgment in favor of Plaintiffs on the issue of liability of the Defendants, and denies summary judgment on the issue of damages. The Court will hold an evidentiary hearing to determine the issue of

constructive resignation, the amount of restitution owed to Plaintiffs, and the award of attorneys' fees and costs, as discussed *supra*. An appropriate Order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

cc/ecf.:     All Counsel of Record.
Date:        September 25, 2008.